MONA Z. HANNA (SBN 131439)
 mhanna@mrllp.com
TODD H. STITT (SBN 179694)
 tstitt@mrllp.com
**MICHELMAN & ROBINSON, LLP**
17901 Von Karman Avenue, Suite 1000
Irvine, CA 92614
Tel. (714) 557-7990; Fax. (714) 557-7991

REUBEN A. GINSBURG (SBN 142732)
 rginsburg@mrllp.com
JESSE J. CONTRERAS (SBN 190538)
 jcontreras@mrllp.com
**MICHELMAN & ROBINSON, LLP**
10880 Wilshire Boulevard, 19th Floor
Los Angeles, CA  90024
Tel. (310) 299-5500; Fax (310) 299-5600

Attorneys for Plaintiffs
Zumasys, Inc., jBASE International, Inc.,
and Total Computing Solutions, LLC

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| ZUMASYS, INC.; JBASE INTERNATIONAL, INC.; and TOTAL COMPUTING SOLUTIONS, LLC,<br><br>            Plaintiffs,<br><br>    v.<br><br>UNITED STATES SMALL BUSINESS ADMINISTRATION; JOVITA CARRANZA, in her Official Capacity as Administrator of the Small Business Administration; UNITED STATES DEPARTMENT OF TREASURY; and STEVEN T. MNUCHIN, in his Official Capacity as Secretary of the Treasury,<br><br>            Defendants. | Case No.:<br><br>**COMPLAINT FOR:**<br>**1. JUDICIAL REVIEW OF FINAL AGENCY ACTION [5 U.S.C. § 706];**<br>**2. DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF.** |

---

**COMPLAINT**

Plaintiffs Zumasys, Inc. ("Zumasys"), jBASE International, Inc. ("jBASE"), and Total Computing Solutions, LLC ("TCS") (collectively "Plaintiffs") hereby allege:

## JURISDICTION AND VENUE

1.    The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because this action raises substantial questions of federal law under the Coronavirus, Aid, Relief, and Economic Security Act, Pub. L. No. 116-136 (2020) ("CARES Act") and the Small Business Act, 15 U.S.C. § 631, *et seq*.

2.    The United States has waived sovereign immunity from suit under 5 U.S.C. § 702 because Plaintiffs seek review of agency action. This Court has personal jurisdiction over Defendants because Defendants operate and have committed acts in this State and in this district that are the subjects of the claims and injuries set forth herein.

3.    There is an actual case or controversy within the meaning of 28 U.S.C. §§ 2201 and 2202 between the parties that invokes the jurisdiction of this Court regarding decisions and final agency actions by Defendants that harm Plaintiffs and are subject to review by this Court. Pursuant to 5 U.S.C. § 704, this case is ripe for judicial review.

4.    Venue in this Court is appropriate under the provisions of 28 U.S.C. § 1391(e).

## INTRODUCTION

5.    The State of California has been affected by a life-threatening global pandemic caused by the COVID-19 virus.  The Governor of California declared a state of emergency on March 4, 2020 and issued a stay home order of unlimited duration on March 19, 2020.  Many local jurisdictions have also issued stay home orders.

**COMPLAINT**

6.     The state of emergency, and stay home orders, has resulted in the closing of nonessential businesses, rendering millions of California workers idle and causing the widespread furloughing and termination of California workers.

7.     To save American jobs, stabilize the United States economy, and to provide other assistance during this unprecedented time, the United States Congress passed the CARES Act. Immediately thereafter, the President signed it into law on March 27, 2020.  Recognizing its purpose, Congress named Title I of the CARES Act the "Keeping American Workers Paid and Employed Act."  Title I includes the Paycheck Protection Program ("PPP"), 15 U.S.C. § 636(a)(36).

8.     As its title says, Title I of the CARES Act was designed to encourage businesses to retain employees and keep them on payroll – *without financially burdening them*.  Stated another way, the PPP was intended to prevent businesses from furloughing or terminating employees.  The PPP accomplishes this by making loans available to eligible business and forgiving those loans to the extent the borrower uses the funds to pay payroll and other specified fixed costs.  The intent was for a business to keep its employees on its payroll so that American workers could get paid.

9.     Over one million businesses applied for and obtained PPP funding based on the plain language of the CARES Act.  As a direct consequence, businesses did not furlough or terminate employees, but rather, used the PPP funds to "Keep American Workers Paid."  Unfortunately, after receiving PPP funds and using those funds to retain employees and pay other permissible fixed costs as Congress intended, "guidance" was issued by Defendants that directly contradicts and changes the CARES Act in a manner that: (1) deprives employers of their eligibility to obtain loan forgiveness, and (2) places employers in a worse financial position than if they had furloughed or terminated their employees.  Specifically, employers that acted in reliance on the CARES Act by obtaining funding and not furloughing or terminating

**COMPLAINT**

their employees, with the expectation the loans would be forgiven, now face the prospect of having to repay the PPP funds with money they either do not have or now must borrow, placing them in a worse financial position than had they never sought the CARES Act funds. The "guidance" is the opposite of what the law intended; that is, to help businesses employ American workers and keep businesses afloat during this Pandemic. Instead, businesses will now be further in debt; debt they otherwise would not have incurred but-for Defendants' "guidance" reversing the CARES Act.

10.     This suit seeks a determination that the improper new requirements set forth in the "guidance" are void and must be withdrawn.

## THE PARTIES

11.     Zumasys is a corporation organized under the laws of the State of California with its principal place of business in San Clemente, California. Zumasys is a privately held small business founded in 2000 and is an information technology company providing software programming services.

12.     jBASE is a corporation organized under the laws of the State of Delaware and is registered in California as a foreign corporation with its principal place of business in San Clemente, California.

13.     TCS is a limited liability company organized under the laws of the State of Utah and registered in California as a foreign limited liability company.

14.     jBASE and TCS are privately held small businesses and wholly-owned subsidiaries of Zumasys. jBASE and TCS are information technology companies.

15.     Defendant United States Small Business Administration (the "SBA") is an independent federal agency created and authorized pursuant to 15 U.S.C. § 633 *et seq*. The SBA maintains a district office at 5 Hutton Centre Dr., Suite 900, Santa Ana, California, 92707, which is within the Central District of California.

16.     Defendant Jovita Carranza is sued in her official capacity only as the Administrator of the SBA. Authority to sue the Administrator is granted by 15 U.S.C. § 634(b).

17.     Defendant United States Department of the Treasury is an executive agency of the United States government. The Treasury maintains an office through its Internal Revenue Service bureau at 801 Civic Center Drive W., Santa Ana, California, 92701, which is within the Central District of California.

18.     Defendant Steven T. Mnuchin is sued in his official capacity only as Secretary of the Treasury.

## CLAIMS COMMON TO ALL COUNTS

### The SBA's Administration of Small Business Loans

19.     The SBA's authority is derived from the Small Business Act, 15 U.S.C. § 631, *et seq*. Regulations promulgated by the SBA are codified in the Federal Register. The SBA also issues guidance documents for compliance with its regulations and the programs it administers. These guidance documents include publicly available Standard Operating Procedures, Policy Notices, Procedural Notices, and other general guidance.

20.     Prior to the CARES Act, the SBA's primary program for assisting small businesses was through its authority to provide loan assistance to small business concerns under Sections 7(a) and 7(b) of the Small Business Act, 15 U.S.C. § 636(a). The CARES Act amended Section 7(a) of the Small Business Act to establish the PPP on a short-term, emergency basis.

21.     Section 7(a) SBA loans are to be used for general business purposes. Under ordinary circumstances, the SBA guarantees a loan made by a lender to applicants who have fulfilled the "credit elsewhere" test demonstrating that the desired credit is not otherwise available on reasonable terms from non-governmental sources.

## The CARES Act

22.     The CARES Act was signed into law on March 27, 2020. Section 1102 of the CARES Act amends the Small Business Act to establish the PPP and allows such loans to any qualifying small business.

23.     The principal purpose of the CARES Act is to serve as a *grant* to eligible small businesses to allow them to retain employees and keep them on payroll and to position them (with such employees) to be able to open their doors when safe to do so in a financially stable position.

24.     Loans made under the PPP are nonrecourse, 15 U.S.C. § 636(a)(36)(F)(v), and eligible recipients are entitled to loan forgiveness to the extent the borrower uses the funds to pay payroll and other permitted costs. 15 U.S.C. § 9005(b).

25.     Under the PPP established by the CARES Act, "any business concern … shall be eligible to receive a covered loan if the business concern … employs not more than … 500 employees." 15 U.S.C. § 636(a)(36)(D)(i).

26.     In evaluating the eligibility of a borrower for a PPP loan, a lender is to consider whether the borrower: (1) was in operation on February 15, 2020; (2) had employees for whom the borrower paid salaries and payroll taxes; or (3) paid independent contractors. 15 U.S.C. § 636(a)(36)(F)(ii)(II).

27.     The CARES Act requires that an eligible recipient applying for a covered loan make a good faith certification:

> (I) that the uncertainty of current economic conditions makes necessary the loan request to support the ongoing operations of the eligible recipient;
>
> (II) acknowledging that funds will be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments;

(III) that the eligible recipient does not have an application pending for a loan under this subsection for the same purpose and duplicative of amounts applied for or received under a covered loan; and

(IV) during the period beginning on February 15, 2020 and ending on December 31, 2020, that the eligible recipient has not received amounts under this subsection for the same purpose and duplicative of amounts applied for or received under a covered loan.

15 U.S.C. § 636(a)(36)(G)(i).

28.     Ordinarily the SBA will not issue a loan to a small business that has access to another line of credit. Specifically:

The Administrator has the authority to direct, and conduct oversight for, the methods by which lenders determine whether a borrower is able to obtain credit elsewhere. ***No financial assistance shall be extended pursuant to this subsection if the applicant can obtain credit elsewhere.*** No immediate participation may be purchased unless it is shown that a deferred participation is not available; and no direct financing may be made unless it is shown that a participation is not available.

15 U.S.C. § 636(a)(1)(A)(i) (emphasis added).

29.     Section 3(h) of the Small Business Act defines "credit elsewhere" as follows:

The term "credit elsewhere" means--

(1) for the purposes of this chapter (except as used in section 636(b) of this title), the availability of credit on reasonable terms and conditions to the individual loan applicant from non-Federal, non-State, or non-local government sources, considering factors associated with conventional lending practices, including--

(A) the business industry in which the loan applicant operates;

(B) whether the loan applicant is an enterprise that has been in operation for a period of not more than 2 years;

(C) the adequacy of the collateral available to secure the requested loan;

(D) the loan term necessary to reasonably assure the ability of the loan applicant to repay the debt from the actual or projected cash flow of the business; and

(E) any other factor relating to the particular credit application, as documented in detail by the lender, that cannot be overcome except through obtaining a Federal loan guarantee under prudent lending standards; and

(2) for the purposes of section 636(b) of this title, the availability of credit on reasonable terms and conditions from non-Federal sources taking into consideration the prevailing rates and terms in the community in or near where the applicant business concern transacts business, or the applicant homeowner resides, for similar purposes and periods of time.

15 U.S.C. § 632(h).

30.     The "credit elsewhere" restriction imposed by the Small Business Act is specifically made *inapplicable* to PPP loans. The CARES Act specifically provides "[d]uring the covered period, the requirement that a small business concern is unable to obtain credit elsewhere as defined in section 3(h), *shall not apply to a covered loan*." 15 U.S.C. § 636(a)(36)(I) (emphasis added).

### Plaintiffs Secure Paycheck Protection Program Loans

31.     Zumasys is a small, privately held business with fewer than 50 employees.

32.     To avoid furloughing or terminating employees, Zumasys applied for a PPP loan through Sunwest Bank on or about April 7, 2020.

33.     Zumasys is eligible to participate in the PPP pursuant to the express terms of the CARES Act.

34.    Zumasys was awarded a PPP loan in the amount of $521,500 on or about April 14, 2020.

35.    Zumasys has used loan funds to satisfy its payroll obligations and pay other permitted fixed costs allowed under the PPP.

36.    jBASE is a small, privately held business with fewer than 10 employees.

37.    To avoid furloughing or terminating employees, jBASE applied for a PPP loan through Sunwest Bank on or about April 3, 2020.

38.    jBASE is eligible to participate in the PPP pursuant to the express terms of the CARES Act.

39.    jBASE was awarded a PPP loan in the amount of $77,029 on or about April 15, 2020.

40.    jBASE has used loan funds to satisfy its payroll obligations and pay other fixed costs allowed under the PPP.

41.    TCS is a small, privately held business with fewer than 10 employees.

42.    To avoid furloughing or terminating employees, TCS applied for a PPP loan through Sunwest Bank on or about April 3, 2020.

43.    TCS is eligible to participate in the PPP pursuant to the express terms of the CARES Act.

44.    TCS was awarded a PPP loan in the amount of $152,830 on or about April 14, 2020.

45.    TCS has used loan funds to satisfy its payroll obligations and pay other fixed costs allowed under the PPP.

## SBA/Treasury Issues FAQ 31 and FAQ 37

46.    On April 23, 2020, the SBA, in consultation with the Treasury, updated its "Paycheck Protection Program Loans Frequently Asked Questions" (the "FAQ").

COMPLAINT

The current version of the FAQ, published on May 3, 2020, is attached as Exhibit A.[1]

47.    The SBA and Treasury identify the purpose of the FAQ as follows: The Small Business Administration (SBA), in consultation with the Department of the Treasury, intends to provide timely additional guidance to address borrower and lender questions concerning the implementation of the Paycheck Protection Program (PPP), established by section 1102 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act or the Act). This document will be updated on a regular basis.

***Borrowers and lenders may rely on the guidance provided in this document as SBA's interpretation of the CARES Act and of the Paycheck Protection Program Interim Final Rule ("PPP Interim Final Rule")***. The U.S. government will not challenge lender PPP actions that conform to this guidance,[2] and to the PPP Interim Final Rule and any subsequent rulemaking in effect at the time. (Emphasis added.)

48.    FAQ 31 states:

31.**Question:** Do businesses owned by large companies with adequate sources of liquidity to support the business's ongoing operations qualify for a PPP loan?

**Answer:** In addition to reviewing applicable affiliation rules to determine eligibility, all borrowers must assess their economic need for a PPP loan under the standard established by the CARES Act and the PPP regulations at the time of the loan application. Although the CARES Act suspends the ordinary requirement that borrowers must be unable to obtain credit elsewhere (as defined in section 3(h) of the Small Business Act), borrowers still must certify in good faith that their PPP loan request is necessary. Specifically, before submitting a PPP application, all borrowers should review carefully the required

---

[1] https://home.treasury.gov/system/files/136/Paycheck-Protection-Program-Frequently-Asked-Questions.pdf

[2] This footnote appears as Footnote 1 of the FAQ and states: "This document does not carry the force and effect of law independent of the statute and regulations on which it is based."

certification that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." Borrowers must make this certification in good faith, taking into account their current business activity and their ability *to access other sources of liquidity* sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business. For example, it is unlikely that a public company with substantial market value and access to capital markets will be able to make the required certification in good faith, and such a company should be prepared to demonstrate to SBA, upon request, the basis for its certification.

Lenders may rely on a borrower's certification regarding the necessity of the loan request. Any borrower that applied for a PPP loan prior to the issuance of this guidance and repays the loan in full by May 7, 2020 will be deemed by SBA to have made the required certification in good faith. (Emphasis added)

49. On April 28, 2020, the SBA, in consultation with the Treasury, further updated its Frequently Asked Questions page to include FAQ 37, which states:

37. **Question:** Do businesses owned by private companies with adequate *sources of liquidity* to support the business's ongoing operations qualify for a PPP loan? (emphasis added)

**Answer:** See response to FAQ #31.

50. The SBA and Treasury interpretation of the CARES Act, as set forth above, purports to re-impose the "credit elsewhere" requirement normally applied to SBA loans in direct contravention of 15 U.S.C. § 636(a)(36)(I), which states that "[d]uring the covered period, the requirement that a small business concern is unable to obtain credit elsewhere as defined in section 3(h), shall not apply to a covered loan."

51. Plaintiffs have access to other credit facilities, but the uncertainty of current economic conditions, and purpose of the PPP, caused Plaintiffs to request PPP loan funds to support ongoing operations. Plaintiffs would not have gone into

debt with the other credit facilities, but consistent with the intent of the CARES Act, they obtained forgivable funds to keep American workers employed.  Specifically, loans issued under the PPP are treated as a *grant* if certain conditions are met and Plaintiffs are taking all steps necessary to satisfy those conditions.  It is only under the PPP that Plaintiffs can access liquidity necessary to retain employees in a manner that is not significantly detrimental to their business, that is, not incurring debt.

52.     Under the express provisions of the CARES Act, Plaintiffs are eligible borrowers entitled to participate in the PPP notwithstanding their access to "credit elsewhere."

53.     FAQ 31 and FAQ 37 purport to deny Plaintiffs' eligibility to participate in the PPP in direct contravention of 15 U.S.C. § 636(a)(36)(I).

54.     Contrary to the law, a consequence to Plaintiffs is that since some of the PPP funds have already been used to retain employees, and if they are now required to repay those funds pursuant to the "guidance," they will have to go into debt, thereby damaging their financial stability.

## FIRST CAUSE OF ACTION

### Judicial Review of Final Agency Action (5 U.S.C. § 706)

### (As to All Defendants)

55.     Plaintiffs re-allege and incorporate by reference each of the numerical paragraphs both above and below as if fully set forth herein.

56.     Under the Administrative Procedures Act ("APA"), a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … not in accordance with the law" or "in excess of statutory … authority." 5 U.S.C. § 706(2)(A) and (C).

57.     FAQ 31 and FAQ 37 promulgated by Defendants are not in accordance with the law and exceed Defendants' authority under the CARES Act. Specifically, FAQ 31 and FAQ 37 purport to re-impose the credit elsewhere requirement on

Payroll Protection Program loans in direct contravention of 15 U.S.C. § 636(a)(36)(I), which directs that "[d]uring the covered period, the requirement that a small business concern is unable to obtain credit elsewhere as defined in section 3(h), shall not apply to a covered loan."

58.     Defendants lacked authority to promulgate FAQ 31 and FAQ 37 precluding borrowers from being eligible recipients of PPP loans if they arguably have access to other sources of credit.  This action by Defendants constituted an improper, and legally impermissible, underground regulation.

59.     Plaintiffs are likely to succeed on the merits of their First Cause of Action.

60.     Plaintiffs have suffered and will continue to suffer irreparable harm in the absence of injunctive relief enjoining Defendants from making any determinations of ineligibility based on the new requirements imposed by FAQ 31 and FAQ 37.

61.     Defendants will suffer no injury if the Court grants the preliminary injunctive relief that Plaintiffs seek.

62.     The public interest will be served if the Court grants the preliminary injunctive relief that Plaintiffs seek.

## SECOND CAUSE OF ACTION

**Declaratory Judgment and Preliminary and Permanent Injunction**

**(28 U.S.C. §§ 2201 and 2202)**

**(As to All Defendants)**

63.     Plaintiffs re-allege and incorporate by reference each of the numerical paragraphs both above and below as if fully set forth herein.

64.     There is an actual controversy between Plaintiffs and Defendants concerning Plaintiffs' eligibility to receive loans issued under the PPP as a consequence of FAQ 31 and FAQ 37.

**COMPLAINT**

65.     Pursuant to 28 U.S.C. § 2201 this Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

66.     FAQ 31 and FAQ 37 promulgated by Defendants are not in accordance with the law and exceed Defendants' authority under the CARES Act. Specifically, FAQ 31 and FAQ 37 purport to re-impose the credit elsewhere requirement on PPP loans in direct contravention of 15 U.S.C. § 636(a)(36)(I), which directs that "[d]uring the covered period, the requirement that a small business concern is unable to obtain credit elsewhere as defined in section 3(h), shall not apply to a covered loan."

67.     Defendants lacked authority to promulgate FAQ 31 and FAQ 37 precluding borrowers from accepting PPP loans if they arguably have access to other sources of credit.

68.     Accordingly, Plaintiffs seek a declaration that FAQ 31 and FAQ 37 are contrary to law and must be withdrawn.

69.     Plaintiffs are likely to succeed on the merits of their Second Cause of Action.

70.     Plaintiffs have suffered and will continue to suffer irreparable harm in the absence of injunctive relief enjoining Defendants from making any determinations of ineligibility based on the requirements imposed by FAQ 31 and FAQ 37.

71.     Defendants will suffer no injury if the Court grants the preliminary injunctive relief that Plaintiffs seek.

72.     The public interest will be served if the Court grants the preliminary injunctive relief that Plaintiffs seek.

///

///

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for Judgment against Defendants as follows:

1.      For preliminary and permanent injunctive relief enjoining Defendants, as well as their employees, agents and representatives, including the SBA's lending banks, from enforcing or utilizing in any fashion or manner whatsoever, FAQ 31 and FAQ 37 in regard to eligibility for loans or loan forgiveness under the Payroll Protection Program of the CARES Act.

2.      As part of those orders, order Defendants, as well as their employees, agents and representatives, to notify, as expeditiously as possible, all SBA lending banks to immediately discontinue utilizing FAQ 31 and FAQ 37 as criteria for determining PPP loan eligibility, and to fully process all PPP loan applications without reference to FAQ 31 or FAQ 37;

3.      For a judgment setting aside FAQ 31 and FAQ 37;

4.      For a judgment declaring FAQ 31 and FAQ 37 unlawful;

5.      All costs of suit;

6.      Such other and further relief as this Court deems just and proper; and

7.      Attorneys' fees.


Dated:  May 4, 2020                         **MICHELMAN & ROBINSON, LLP**

                                            By:    */s/ Mona Z. Hanna*
                                                   Mona Z. Hanna, Esq.
                                                   Todd H. Stitt, Esq.
                                                   Reuben A. Ginsburg, Esq.
                                                   Jesse J. Contreras, Esq.
                                                   Attorneys for Plaintiffs
                                                   Zumasys, Inc.,
                                                   jBASE International, Inc., and
                                                   Total Computing Solutions, LLC

**COMPLAINT**

# EXHIBIT A

As of May 3, 2020

**PAYCHECK PROTECTION PROGRAM LOANS**
Frequently Asked Questions (FAQs)

The Small Business Administration (SBA), in consultation with the Department of the Treasury, intends to provide timely additional guidance to address borrower and lender questions concerning the implementation of the Paycheck Protection Program (PPP), established by section 1102 of the Coronavirus Aid, Relief, and Economic Security Act (CARES Act or the Act).  This document will be updated on a regular basis.

Borrowers and lenders may rely on the guidance provided in this document as SBA's interpretation of the CARES Act and of the Paycheck Protection Program Interim Final Rules ("PPP Interim Final Rules") (link).  The U.S. government will not challenge lender PPP actions that conform to this guidance,[1] and to the PPP Interim Final Rules and any subsequent rulemaking in effect at the time.

1. **Question:**  Paragraph 3.b.iii of the PPP Interim Final Rule states that lenders must "[c]onfirm the dollar amount of average monthly payroll costs for the preceding calendar year by reviewing the payroll documentation submitted with the borrower's application."  Does that require the lender to replicate every borrower's calculations?

   **Answer:**  No. Providing an accurate calculation of payroll costs is the responsibility of the borrower, and the borrower attests to the accuracy of those calculations on the Borrower Application Form.  Lenders are expected to perform a good faith review, in a reasonable time, of the borrower's calculations and supporting documents concerning average monthly payroll cost.  For example, minimal review of calculations based on a payroll report by a recognized third-party payroll processor would be reasonable.  In addition, as the PPP Interim Final Rule indicates, lenders may rely on borrower representations, including with respect to amounts required to be excluded from payroll costs.

   If the lender identifies errors in the borrower's calculation or material lack of substantiation in the borrower's supporting documents, the lender should work with the borrower to remedy the issue.[2]

2. **Question:**  Are small business concerns (as defined in section 3 of the Small Business Act, 15 U.S.C. 632) required to have 500 or fewer employees to be eligible borrowers in the PPP?

   **Answer:**  No.  Small business concerns can be eligible borrowers even if they have more than 500 employees, as long as they satisfy the existing statutory and regulatory definition of a "small business concern" under section 3 of the Small Business Act, 15 U.S.C. 632.  A business can qualify if it meets the SBA employee-based or revenue-

---

[1] This document does not carry the force and effect of law independent of the statute and regulations on which it is based.
[2] Question 1 published April 3, 2020.

As of May 3, 2020

based size standard corresponding to its primary industry.  Go to www.sba.gov/size for the industry size standards.

Additionally, a business can qualify for the Paycheck Protection Program as a small business concern if it met both tests in SBA's "alternative size standard" as of March 27, 2020: (1) maximum tangible net worth of the business is not more than $15 million; and (2) the average net income after Federal income taxes (excluding any carry-over losses) of the business for the two full fiscal years before the date of the application is not more than $5 million.

A business that qualifies as a small business concern under section 3 of the Small Business Act, 15 U.S.C. 632, may truthfully attest to its eligibility for PPP loans on the Borrower Application Form, unless otherwise ineligible.

3. **Question:**  Does my business have to qualify as a small business concern (as defined in section 3 of the Small Business Act, 15 U.S.C. 632) in order to participate in the PPP?

   **Answer:**  No.  In addition to small business concerns, a business is eligible for a PPP loan if the business has 500 or fewer employees whose principal place of residence is in the United States, or the business meets the SBA employee-based size standards for the industry in which it operates (if applicable).  Similarly, PPP loans are also available for qualifying tax-exempt nonprofit organizations described in section 501(c)(3) of the Internal Revenue Code (IRC), tax-exempt veterans organization described in section 501(c)(19) of the IRC, and Tribal business concerns described in section 31(b)(2)(C) of the Small Business Act that have 500 or fewer employees whose principal place of residence is in the United States, or meet the SBA employee-based size standards for the industry in which they operate.

4. **Question:**  Are lenders required to make an independent determination regarding applicability of affiliation rules under 13 C.F.R. 121.301(f) to borrowers?

   **Answer:**  No.  It is the responsibility of the borrower to determine which entities (if any) are its affiliates and determine the employee headcount of the borrower and its affiliates. Lenders are permitted to rely on borrowers' certifications.

5. **Question:**  Are borrowers required to apply SBA's affiliation rules under 13 C.F.R. 121.301(f)?

   **Answer:**  Yes.  Borrowers must apply the affiliation rules set forth in SBA's Interim Final Rule on Affiliation.  A borrower must certify on the Borrower Application Form that the borrower is eligible to receive a PPP loan, and that certification means that the borrower is a small business concern as defined in section 3 of the Small Business Act (15 U.S.C. 632), meets the applicable SBA employee-based or revenue-based size standard, or meets the tests in SBA's alternative size standard, after applying the affiliation rules, if applicable.  SBA's existing affiliation exclusions apply to the PPP, including, for example the exclusions under 13 CFR 121.103(b)(2).

6. **Question:** The affiliation rule based on ownership (13 C.F.R. 121.301(f)(1)) states that SBA will deem a minority shareholder in a business to control the business if the shareholder has the right to prevent a quorum or otherwise block action by the board of directors or shareholders. If a minority shareholder irrevocably gives up those rights, is it still considered to be an affiliate of the business?

   **Answer:** No. If a minority shareholder in a business irrevocably waives or relinquishes any existing rights specified in 13 C.F.R. 121.301(f)(1), the minority shareholder would no longer be an affiliate of the business (assuming no other relationship that triggers the affiliation rules).

7. **Question:** The CARES Act excludes from the definition of payroll costs any employee compensation in excess of an annual salary of $100,000. Does that exclusion apply to all employee benefits of monetary value?

   **Answer:** No. The exclusion of compensation in excess of $100,000 annually applies only to cash compensation, not to non-cash benefits, including:
   - employer contributions to defined-benefit or defined-contribution retirement plans;
   - payment for the provision of employee benefits consisting of group health care coverage, including insurance premiums; and
   - payment of state and local taxes assessed on compensation of employees.

8. **Question:** Do PPP loans cover paid sick leave?

   **Answer:** Yes. PPP loans covers payroll costs, including costs for employee vacation, parental, family, medical, and sick leave. However, the CARES Act excludes qualified sick and family leave wages for which a credit is allowed under sections 7001 and 7003 of the Families First Coronavirus Response Act (Public Law 116–127). Learn more about the Paid Sick Leave Refundable Credit here.

9. **Question:** My small business is a seasonal business whose activity increases from April to June. Considering activity from that period would be a more accurate reflection of my business's operations. However, my small business was not fully ramped up on February 15, 2020. Am I still eligible?

   **Answer:** In evaluating a borrower's eligibility, a lender may consider whether a seasonal borrower was in operation on February 15, 2020 or for an 8-week period between February 15, 2019 and June 30, 2019.

10. **Question:** What if an eligible borrower contracts with a third-party payer such as a payroll provider or a Professional Employer Organization (PEO) to process payroll and report payroll taxes?

    **Answer:** SBA recognizes that eligible borrowers that use PEOs or similar payroll providers are required under some state registration laws to report wage and other data on

As of May 3, 2020

the Employer Identification Number (EIN) of the PEO or other payroll provider.  In these cases, payroll documentation provided by the payroll provider that indicates the amount of wages and payroll taxes reported to the IRS by the payroll provider for the borrower's employees will be considered acceptable PPP loan payroll documentation.  Relevant information from a Schedule R (Form 941), Allocation Schedule for Aggregate Form 941 Filers, attached to the PEO's or other payroll provider's Form 941, Employer's Quarterly Federal Tax Return, should be used if it is available; otherwise, the eligible borrower should obtain a statement from the payroll provider documenting the amount of wages and payroll taxes.  In addition, employees of the eligible borrower will not be considered employees of the eligible borrower's payroll provider or PEO.

11. **Question:**  May lenders accept signatures from a single individual who is authorized to sign on behalf of the borrower?

**Answer:**  Yes.  However, the borrower should bear in mind that, as the Borrower Application Form indicates, only an authorized representative of the business seeking a loan may sign on behalf of the business.  An individual's signature as an "Authorized Representative of Applicant" is a representation to the lender and to the U.S. government that the signer is authorized to make the certifications, including with respect to the applicant and each owner of 20% or more of the applicant's equity, contained in the Borrower Application Form.  Lenders may rely on that representation and accept a single individual's signature on that basis.

12. **Question:**  I need to request a loan to support my small business operations in light of current economic uncertainty.  However, I pleaded guilty to a felony crime a very long time ago.  Am I still eligible for the PPP?

**Answer:**  Yes. Businesses are only ineligible if an owner of 20 percent or more of the equity of the applicant is presently incarcerated, on probation, on parole; subject to an indictment, criminal information, arraignment, or other means by which formal criminal charges are brought in any jurisdiction; or, within the last five years, for any felony, has been convicted; pleaded guilty; pleaded nolo contendere; been placed on pretrial diversion; or been placed on any form of parole or probation (including probation before judgment).

13. **Question:**  Are lenders permitted to use their own online portals and an electronic form that they create to collect the same information and certifications as in the Borrower Application Form, in order to complete implementation of their online portals?

**Answer:**  Yes.  Lenders may use their own online systems and a form they establish that asks for the same information (using the same language) as the Borrower Application Form.  Lenders are still required to send the data to SBA using SBA's interface.

14. **Question:**  What time period should borrowers use to determine their number of employees and payroll costs to calculate their maximum loan amounts?

As of May 3, 2020

**Answer:**  In general, borrowers can calculate their aggregate payroll costs using data either from the previous 12 months or from calendar year 2019.  For seasonal businesses, the applicant may use average monthly payroll for the period between February 15, 2019, or March 1, 2019, and June 30, 2019.  An applicant that was not in business from February 15, 2019 to June 30, 2019 may use the average monthly payroll costs for the period January 1, 2020 through February 29, 2020.

Borrowers may use their average employment over the same time periods to determine their number of employees, for the purposes of applying an employee-based size standard.  Alternatively, borrowers may elect to use SBA's usual calculation: the average number of employees per pay period in the 12 completed calendar months prior to the date of the loan application (or the average number of employees for each of the pay periods that the business has been operational, if it has not been operational for 12 months).

15. **Question:**  Should payments that an eligible borrower made to an independent contractor or sole proprietor be included in calculations of the eligible borrower's payroll costs?

**Answer:**  No.  Any amounts that an eligible borrower has paid to an independent contractor or sole proprietor should be excluded from the eligible business's payroll costs.  However, an independent contractor or sole proprietor will itself be eligible for a loan under the PPP, if it satisfies the applicable requirements.

16. **Question:**  How should a borrower account for federal taxes when determining its payroll costs for purposes of the maximum loan amount, allowable uses of a PPP loan, and the amount of a loan that may be forgiven?

**Answer:**  Under the Act, payroll costs are calculated on a gross basis without regard to (i.e., not including subtractions or additions based on) federal taxes imposed or withheld, such as the employee's and employer's share of Federal Insurance Contributions Act (FICA) and income taxes required to be withheld from employees.  As a result, payroll costs are not reduced by taxes imposed on an employee and required to be withheld by the employer, but payroll costs do not include the employer's share of payroll tax.  For example, an employee who earned $4,000 per month in gross wages, from which $500 in federal taxes was withheld, would count as $4,000 in payroll costs.  The employee would receive $3,500, and $500 would be paid to the federal government.  However, the employer-side federal payroll taxes imposed on the $4,000 in wages are excluded from payroll costs under the statute.[3]

---

[3] The definition of "payroll costs" in the CARES Act, 15 U.S.C. 636(a)(36)(A)(viii), excludes "taxes imposed or withheld under chapters 21, 22, or 24 of the Internal Revenue Code of 1986 during the covered period," defined as February 15, 2020, to June 30, 2020.  As described above, the SBA interprets this statutory exclusion to mean that payroll costs are calculated on a gross basis, without subtracting federal taxes that are imposed on the employee or withheld from employee wages.  Unlike employer-side payroll taxes, such employee-side taxes are ordinarily expressed as a reduction in employee take-home pay; their exclusion from the definition of payroll costs means payroll costs should not be reduced based on taxes imposed on the employee or withheld from employee wages.  This interpretation is consistent with the text of the statute and advances the legislative purpose of ensuring workers

As of May 3, 2020

17. **Question:**  I filed or approved a loan application based on the version of the PPP Interim Final Rule published on April 2, 2020.  Do I need to take any action based on the updated guidance in these FAQs?

    **Answer:**  No.  Borrowers and lenders may rely on the laws, rules, and guidance available at the time of the relevant application.  However, borrowers whose previously submitted loan applications have not yet been processed may revise their applications based on clarifications reflected in these FAQs.

18. **Question:**  Are PPP loans for existing customers considered new accounts for FinCEN Rule CDD purposes?  Are lenders required to collect, certify, or verify beneficial ownership information in accordance with the rule requirements for existing customers?

    **Answer:**  If the PPP loan is being made to an existing customer and the necessary information was previously verified, you do not need to re-verify the information.

    Furthermore, if federally insured depository institutions and federally insured credit unions eligible to participate in the PPP program have not yet collected beneficial ownership information on existing customers, such institutions do not need to collect and verify beneficial ownership information for those customers applying for new PPP loans, unless otherwise indicated by the lender's risk-based approach to BSA compliance.[4]

19. **Question:**  Do lenders have to use a promissory note provided by SBA or may they use their own?

    **Answer:**  Lenders may use their own promissory note or an SBA form of promissory note.

20. **Question:**  The amount of forgiveness of a PPP loan depends on the borrower's payroll costs over an eight-week period; when does that eight-week period begin?

    **Answer:**  The eight-week period begins on the date the lender makes the first disbursement of the PPP loan to the borrower. The lender must make the first disbursement of the loan no later than ten calendar days from the date of loan approval.[5]

21. **Question:**  Do lenders need a separate SBA Authorization document to issue PPP loans?

    **Answer:**  No.  A lender does not need a separate SBA Authorization for SBA to guarantee a PPP loan.  However, lenders must have executed SBA Form 2484 (the

---

remain paid and employed.  Further, because the reference period for determining a borrower's maximum loan amount will largely or entirely precede the period from February 15, 2020, to June 30, 2020, and the period during which borrowers will be subject to the restrictions on allowable uses of the loans may extend beyond that period, for purposes of the determination of allowable uses of loans and the amount of loan forgiveness, this statutory exclusion will apply with respect to such taxes imposed or withheld at any time, not only during such period.

[4] Questions 2 – 18 published April 6, 2020.

[5] Questions 19 – 20 published April 8, 2020.

As of May 3, 2020

Lender Application Form for the Paycheck Protection Program)[6] to issue PPP loans and receive a loan number for each originated PPP loan. Lenders may include in their promissory notes for PPP loans any terms and conditions, including relating to amortization and disclosure, that are not inconsistent with Sections 1102 and 1106 of the CARES Act, the PPP Interim Final Rules and guidance, and SBA Form 2484.

22. **Question:** I am a non-bank lender that meets all applicable criteria of the PPP Interim Final Rule. Will I be automatically enrolled as a PPP lender? What criteria will SBA and the Treasury Department use to assess whether to approve my application to participate as a PPP lender?

   **Answer:** We encourage lenders that are not currently 7(a) lenders to apply in order to increase the scope of PPP lending options and the speed with which PPP loans can be disbursed to help small businesses across America. We recognize that financial technology solutions can promote efficiency and financial inclusion in implementing the PPP. Applicants should submit SBA Form 3507 and the relevant attachments to NFRLApplicationForPPP@sba.gov. Submission of the SBA Form 3507 does not result in automatic enrollment in the PPP. SBA and the Treasury Department will evaluate each application from a non-bank or non-insured depository institution lender and determine whether the applicant has the necessary qualifications to process, close, disburse, and service PPP loans made with SBA's guarantee. SBA may request additional information from the applicant before making a determination.

23. **Question:** How do the $10 million cap and affiliation rules work for franchises?

   **Answer:** If a franchise brand is listed on the SBA Franchise Directory, each of its franchisees that meets the applicable size standard can apply for a PPP loan. (The franchisor does not apply on behalf of its franchisees.) The $10 million cap on PPP loans is a limit per franchisee entity, and each franchisee is limited to one PPP loan.

   Franchise brands that have been denied listing on the Directory because of affiliation between franchisor and franchisee may request listing to receive PPP loans. SBA will not apply affiliation rules to a franchise brand requesting listing on the Directory to participate in the PPP, but SBA will confirm that the brand is otherwise eligible for listing on the Directory.

24. **Question:** How do the $10 million cap and affiliation rules work for hotels and restaurants (and any business assigned a North American Industry Classification System (NAICS) code beginning with 72)?

   **Answer:** Under the CARES Act, any single business entity that is assigned a NAICS code beginning with 72 (including hotels and restaurants) and that employs not more than 500 employees per physical location is eligible to receive a PPP loan.

---

[6] This requirement is satisfied by a lender when the lender completes the process of submitting a loan through the E-Tran system; no transmission or retention of a physical copy of Form 2484 is required.

In addition, SBA's affiliation rules (13 CFR 121.103 and 13 CFR 121.301) do not apply to any business entity that is assigned a NAICS code beginning with 72 and that employs not more than a total of 500 employees.  As a result, if each hotel or restaurant location owned by a parent business is a separate legal business entity, each hotel or restaurant location that employs not more than 500 employees is permitted to apply for a separate PPP loan provided it uses its unique EIN.

The $10 million maximum loan amount limitation applies to each eligible business entity, because individual business entities cannot apply for more than one loan.  The following examples illustrate how these principles apply.

Example 1.  Company X directly owns multiple restaurants and has no affiliates.
- Company X may apply for a PPP loan if it employs 500 or fewer employees per location (including at its headquarters), even if the total number of employees employed across all locations is over 500.

Example 2.  Company X wholly owns Company Y and Company Z (as a result, Companies X, Y, and Z are all affiliates of one another).  Company Y and Company Z each own a single restaurant with 500 or fewer employees.
- Company Y and Company Z can each apply for a separate PPP loan, because each has 500 or fewer employees.  The affiliation rules do not apply, because Company Y and Company Z each has 500 or fewer employees and is in the food services business (with a NAICS code beginning with 72).

Example 3.  Company X wholly owns Company Y and Company Z (as a result, Companies X, Y, and Z are all affiliates of one another).  Company Y owns a restaurant with 400 employees.  Company Z is a construction company with 400 employees.
- Company Y is eligible for a PPP loan because it has 500 or fewer employees.  The affiliation rules do not apply to Company Y, because it has 500 or fewer employees and is in the food services business (with a NAICS code beginning with 72).
- The waiver of the affiliation rules does not apply to Company Z, because Company Z is in the construction industry.  Under SBA's affiliation rules, 13 CFR 121.301(f)(1) and (3), Company Y and Company Z are affiliates of one another because they are under the common control of Company X, which wholly owns both companies.  This means that the size of Company Z is determined by adding its employees to those of Companies X and Y.  Therefore, Company Z is deemed to have more than 500 employees, together with its affiliates.  However, Company Z may be eligible to receive a PPP loan as a small business concern if it, together with Companies X and Y, meets SBA's other applicable size standards," as explained in FAQ #2.

25. **Question:**  Does the information lenders are required to collect from PPP applicants regarding every owner who has a 20% or greater ownership stake in the applicant business (i.e., owner name, title, ownership %, TIN, and address) satisfy a lender's obligation to collect beneficial ownership information (which has a 25% ownership threshold) under the Bank Secrecy Act?

As of May 3, 2020

**Answer:**

<u>For lenders with existing customers</u>:  With respect to collecting beneficial ownership information for owners holding a 20% or greater ownership interest, if the PPP loan is being made to an existing customer and the lender previously verified the necessary information, the lender does not need to re-verify the information.  Furthermore, if federally insured depository institutions and federally insured credit unions eligible to participate in the PPP program have not yet collected such beneficial ownership information on existing customers, such institutions do not need to collect and verify beneficial ownership information for those customers applying for new PPP loans, unless otherwise indicated by the lender's risk-based approach to Bank Secrecy Act (BSA) compliance.

<u>For lenders with new customers</u>:  For new customers, the lender's collection of the following information from all natural persons with a 20% or greater ownership stake in the applicant business will be deemed to satisfy applicable BSA requirements and FinCEN regulations governing the collection of beneficial ownership information:  owner name, title, ownership %, TIN, address, and date of birth.  If any ownership interest of 20% or greater in the applicant business belongs to a business or other legal entity, lenders will need to collect appropriate beneficial ownership information for that entity. If you have questions about requirements related to beneficial ownership, go to https://www.fincen.gov/resources/statutes-and-regulations/cdd-final-rule.  Decisions regarding further verification of beneficial ownership information collected from new customers should be made pursuant to the lender's risk-based approach to BSA compliance.[7]

26. **Question:**  SBA regulations require approval by SBA's Standards of Conduct Committee (SCC) for SBA Assistance, other than disaster assistance, to an entity, if its sole proprietor, partner, officer, director, or stockholder with a 10 percent or more interest is: a current SBA employee; a Member of Congress; an appointed official or employee of the legislative or judicial branch; a member or employee of an SBA Advisory Council or SCORE volunteer; or a household member of any of the preceding individuals.  Do these entities need the approval of the SCC in order to be eligible for a PPP loan?

    **Answer:**  The SCC has authorized a blanket approval for PPP loans to such entities so that further action by the SCC is not necessary in the PPP program.

27. **Question:**  SBA regulations require a written statement of no objection by the pertinent Department or military service before it provides any SBA Assistance, other than disaster loans, to an entity, if its sole proprietor, partner, officer, director, or stockholder with a 10 percent or more interest, or if a household member of any of the preceding individuals, is an employee of another Government Department or Agency having a grade of at least GS-13 or its equivalent.  Does this requirement apply to PPP loans?

---

[7] Questions 21 – 25 published April 13, 2020.

As of May 3, 2020

**Answer:**  No.  The SCC has determined that a written statement of no objection is not required from another Government Department or Agency for PPP loans.

28. **Question:**  Is a lender permitted to submit a PPP loan application to SBA through E-Tran before the lender has fulfilled its responsibility to review the required borrower documentation and calculation of payroll costs?

   **Answer:**  No.  Before a lender submits a PPP loan through E-Tran, the lender must have collected the information and certifications contained in the Borrower Application Form and the lender must have fulfilled its obligations set forth in paragraphs 3.b.(i)-(iii) of the PPP Interim Final Rule.  Please refer to the Interim Final Rule and FAQ #1 for more information on the lender's responsibility regarding confirmation of payroll costs.

   Lenders who did not understand that these steps are required before submission to E-Tran need not withdraw applications submitted to E-Tran before April 14, 2020, but must fulfill lender responsibilities with respect to those applications as soon as practicable and no later than loan closing.[8]

29. **Question:**  Can lenders use scanned copies of documents or E-signatures or E-consents permitted by the E-sign Act?

   **Answer:**  Yes.  All PPP lenders may accept scanned copies of signed loan applications and documents containing the information and certifications required by SBA Form 2483 and the promissory note used for the PPP loan.  Additionally, lenders may also accept any form of E-consent or E-signature that complies with the requirements of the Electronic Signatures in Global and National Commerce Act (P.L. 106-229).

   If electronic signatures are not feasible, when obtaining a wet ink signature without in-person contact, lenders should take appropriate steps to ensure the proper party has executed the document.

   This guidance does not supersede signature requirements imposed by other applicable law, including by the lender's primary federal regulator.[9]

30. **Question:**  Can a lender sell a PPP loan into the secondary market?

   **Answer:**  Yes.  A PPP loan may be sold into the secondary market at any time after the loan is fully disbursed.  A secondary market sale of a PPP loan does not require SBA approval.  A PPP loan sold into the secondary market is 100% SBA guaranteed.  A PPP loan may be sold on the secondary market at a premium or a discount to par value.[10]

---

[8] Questions 26 – 28 published April 14, 2020.
[9] Question 29 published April 15, 2020.
[10] Question 30 published April 17, 2020.

As of May 3, 2020

31. **Question:**  Do businesses owned by large companies with adequate sources of liquidity to support the business's ongoing operations qualify for a PPP loan?

   **Answer:**  In addition to reviewing applicable affiliation rules to determine eligibility, all borrowers must assess their economic need for a PPP loan under the standard established by the CARES Act and the PPP regulations at the time of the loan application.  Although the CARES Act suspends the ordinary requirement that borrowers must be unable to obtain credit elsewhere (as defined in section 3(h) of the Small Business Act), borrowers still must certify in good faith that their PPP loan request is necessary.  Specifically, before submitting a PPP application, all borrowers should review carefully the required certification that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."  Borrowers must make this certification in good faith, taking into account their current business activity and their ability to access other sources of liquidity sufficient to support their ongoing operations in a manner that is not significantly detrimental to the business.  For example, it is unlikely that a public company with substantial market value and access to capital markets will be able to make the required certification in good faith, and such a company should be prepared to demonstrate to SBA, upon request, the basis for its certification.

   Lenders may rely on a borrower's certification regarding the necessity of the loan request.  Any borrower that applied for a PPP loan prior to the issuance of this guidance and repays the loan in full by May 7, 2020 will be deemed by SBA to have made the required certification in good faith.[11]

32. **Question:**  Does the cost of a housing stipend or allowance provided to an employee as part of compensation count toward payroll costs?

   **Answer:**  Yes. Payroll costs includes all cash compensation paid to employees, subject to the $100,000 annual compensation per employee limitation.

33. **Question:**  Is there existing guidance to help PPP applicants and lenders determine whether an individual employee's principal place of residence is in the United States?

   **Answer:**  PPP applicants and lenders may consider IRS regulations (26 CFR § 1.121-1(b)(2)) when determining whether an individual employee's principal place of residence is in the United States.

34. **Question:**  Are agricultural producers, farmers, and ranchers eligible for PPP loans?

   **Answer:**  Yes.  Agricultural producers, farmers, and ranchers are eligible for PPP loans if: (i) the business has 500 or fewer employees, or (ii) the business fits within the revenue-based sized standard, which is average annual receipts of $1 million.

   Additionally, agricultural producers, farmers, and ranchers can qualify for PPP loans as a small business concern if their business meets SBA's "alternative size standard."  The

---

[11] Question 31 published April 23, 2020.

"alternative size standard" is currently: (1) maximum net worth of the business is not more than $15 million, and (2) the average net income after Federal income taxes (excluding any carry-over losses) of the business for the two full fiscal years before the date of the application is not more than $5 million.

For all of these criteria, the applicant must include its affiliates in its calculations.  Link to Applicable Affiliation Rules for the PPP.

35. **Question:**  Are agricultural and other forms of cooperatives eligible to receive PPP loans?

    **Answer:**  As long as other PPP eligibility requirements are met, small agricultural cooperatives and other cooperatives may receive PPP loans.[12]

36. **Question:**  To determine borrower eligibility under the 500-employee or other applicable threshold established by the CARES Act, must a borrower count all employees or only full-time equivalent employees?

    **Answer:**  For purposes of loan eligibility, the CARES Act defines the term employee to include "individuals employed on a full-time, part-time, or other basis."  A borrower must therefore calculate the total number of employees, including part-time employees, when determining their employee headcount for purposes of the eligibility threshold.  For example, if a borrower has 200 full-time employees and 50 part-time employees each working 10 hours per week, the borrower has a total of 250 employees.

    By contrast, for purposes of loan forgiveness, the CARES Act uses the standard of "full-time equivalent employees" to determine the extent to which the loan forgiveness amount will be reduced in the event of workforce reductions.[13]

37. **Question:**  Do businesses owned by private companies with adequate sources of liquidity to support the business's ongoing operations qualify for a PPP loan?

    **Answer:**  See response to FAQ #31.[14]

38. **Question:**  Section 1102 of the CARES Act provides that PPP loans are available only to applicants that were "in operation on February 15, 2020."  Is a business that was in operation on February 15, 2020 but had a change in ownership after February 15, 2020 eligible for a PPP loan?

    **Answer:**  Yes.  As long as the business was in operation on February 15, 2020, if it meets the other eligibility criteria, the business is eligible to apply for a PPP loan regardless of the change in ownership.  In addition, where there is a change in ownership effectuated through a purchase of substantially all assets of a business that was in operation on

---

[12] Questions 32 – 35 published April 24, 2020.
[13] Questions 36 published April 26, 2020.
[14] Question 37 published April 28, 2020.

As of May 3, 2020

February 15, the business acquiring the assets will be eligible to apply for a PPP loan even if the change in ownership results in the assignment of a new tax ID number and even if the acquiring business was not in operation until after February 15, 2020.  If the acquiring business has maintained the operations of the pre-sale business, the acquiring business may rely on the historic payroll costs and headcount of the pre-sale business for the purposes of its PPP application, except where the pre-sale business had applied for and received a PPP loan.  The Administrator, in consultation with the Secretary, has determined that the requirement that a business "was in operation on February 15, 2020" should be applied based on the economic realities of the business's operations.

39. **Question:**  Will SBA review individual PPP loan files?

**Answer:**  Yes.  In FAQ #31, SBA reminded all borrowers of an important certification required to obtain a PPP loan.  To further ensure PPP loans are limited to eligible borrowers in need, the SBA has decided, in consultation with the Department of the Treasury, that it will review all loans in excess of $2 million, in addition to other loans as appropriate, following the lender's submission of the borrower's loan forgiveness application.  Additional guidance implementing this procedure will be forthcoming.

The outcome of SBA's review of loan files will not affect SBA's guarantee of any loan for which the lender complied with the lender obligations set forth in paragraphs III.3.b(i)-(iii) of the Paycheck Protection Program Rule (April 2, 2020) and further explained in FAQ #1.[15]

40. **Question:**  Will a borrower's PPP loan forgiveness amount (pursuant to section 1106 of the CARES Act and SBA's implementing rules and guidance) be reduced if the borrower laid off an employee, offered to rehire the same employee, but the employee declined the offer?

**Answer:**  No.  As an exercise of the Administrator's and the Secretary's authority under Section 1106(d)(6) of the CARES Act to prescribe regulations granting de minimis exemptions from the Act's limits on loan forgiveness, SBA and Treasury intend to issue an interim final rule excluding laid-off employees whom the borrower offered to rehire (for the same salary/wages and same number of hours) from the CARES Act's loan forgiveness reduction calculation.  The interim final rule will specify that, to qualify for this exception, the borrower must have made a good faith, written offer of rehire, and the employee's rejection of that offer must be documented by the borrower.  Employees and employers should be aware that employees who reject offers of re-employment may forfeit eligibility for continued unemployment compensation.

41. **Question:**  Can a seasonal employer that elects to use a 12-week period between May 1, 2019 and September 15, 2019 to calculate its maximum PPP loan amount under the interim final rule issued by Treasury on April 27, 2020, make all the required certifications on the Borrower Application Form?

---

[15] Questions 38 – 39 published April 29, 2020.

As of May 3, 2020

**Answer:**  Yes.  The Borrower Application Form requires applicants to certify that "The Applicant is eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program."  On April 27, 2020, Treasury issued an interim final rule allowing seasonal borrowers to use an alternative base period for purposes of calculating the loan amount for which they are eligible under the PPP.  An applicant that is otherwise in compliance with applicable SBA requirements, and that complies with Treasury's interim final rule on seasonal workers, will be deemed eligible for a PPP loan under SBA rules.  Instead of following the instructions on page 3 of the Borrower Application Form for the time period for calculating average monthly payroll for seasonal businesses, an applicant may elect to use the time period in Treasury's interim final rule on seasonal workers.

42.  **Question:**  Do nonprofit hospitals exempt from taxation under section 115 of the Internal Revenue Code qualify as "nonprofit organizations" under section 1102 of the CARES Act?

**Answer:**  Section 1102 of the CARES Act defines the term "nonprofit organization" as "an organization that is described in section 501(c)(3) of the Internal Revenue Code of 1986 and that is exempt from taxation under section 501(a) of such Code."  The Administrator, in consultation with the Secretary of the Treasury, understands that nonprofit hospitals exempt from taxation under section 115 of the Internal Revenue Code are unique in that many such hospitals may meet the description set forth in section 501(c)(3) of the Internal Revenue Code to qualify for tax exemption under section 501(a), but have not sought to be recognized by the IRS as such because they are otherwise fully tax-exempt under a different provision of the Internal Revenue Code.

Accordingly, the Administrator will treat a nonprofit hospital exempt from taxation under section 115 of the Internal Revenue Code as meeting the definition of "nonprofit organization" under section 1102 of the CARES Act if the hospital reasonably determines, in a written record maintained by the hospital, that it is an organization described in section 501(c)(3) of the Internal Revenue Code and is therefore within a category of organization that is exempt from taxation under section 501(a).[16]  The hospital's certification of eligibility on the Borrower Application Form cannot be made without this determination.  This approach helps accomplish the statutory purpose of ensuring that a broad range of borrowers, including entities that are helping to lead the medical response to the ongoing pandemic, can benefit from the loans provided under the PPP.

---

[16] This determination need not account for the ancillary conditions set forth in section 501(r) of the Internal Revenue Code and elsewhere associated with securing the tax exemption under that section.  Section 501(r) states that a hospital organization shall not be treated as described in section 501(c)(3) unless it meets certain community health and other requirements.  However, section 1102 of the CARES Act defines the term "nonprofit organization" solely by reference to section 501(c)(3), and section 501(r) does not amend section 501(c)(3).  Therefore, for purposes of the PPP, the requirements of section 501(r) do not apply to the determination of whether an organization is "described in section 501(c)(3)."

As of May 3, 2020

This guidance is solely for purposes of qualification as a "nonprofit organization" under section 1102 of the CARES Act and related purposes of the CARES Act, and does not have any consequences for federal tax law purposes.  Nonprofit hospitals should also review all other applicable eligibility criteria, including the *Interim Final Rules on Promissory Notes, Authorizations, Affiliation, and Eligibility* (April 28, 2020) regarding an important limitation on ownership by state or local governments.  85 FR 23450, 23451.[17]

---

[17] Questions 40 – 42 published May 3, 2020.